IN THE US DISTRICT COURT FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| ALEXANDRA BRADLEY, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | Case No: |
| ) | |
| UNIFIED GOVERNMENT OF WYANDOTTE ) | |
| COUNTY/KANSAS CITY, KANSAS ) | |
| As Representative of Kansas City Board of ) | |
| Public Utilities, ) | |
| 701 N. 7th St. ) | **Jury Trial Demanded** |
| Kansas City, KS 66101, ) | |
| ) | |
| Serve: Brett Deichler ) | |
| Unified Government Clerk ) | |
| 710 N. 7th Street, Suite 323 ) | |
| Kansas City, KS 66101 ) | |
| ) | |
| Defendant. ) | |

**COMPLAINT**

COMES NOW Plaintiff, Alexandra Bradley, and for her causes of action against Defendant Unified Government of Wyandotte County/Kansas City, Kansas as Representative of Kansas City Board of Public Utilities alleges and avers as follows:

**PARTIES, GENERAL ALLEGATIONS, JURISDICTION AND VENUE**

1. Plaintiff Alexandra Bradley (formerly known as Alexandra Whisler), (hereinafter "Plaintiff" or "Bradley") is an individual who at all relevant times was, and currently is, a resident of Kansas City, Kansas, and was employed by Kansas Board of Public Utilities in Kansas City, Kansas.

2. Defendant Unified Government of Wyandotte County/Kansas City, Kansas (hereinafter "Defendant" or "Unified Government") is a Kansas governmental entity. The Unified Government acts as a Representative of Kansas City Board of Public Utilities (hereinafter "BPU") and may be served by serving the Unified Government Clerk, Brett

Deichler, at 710 N. 7th Street, Suite 323, Kansas City, Kansas 66101.

3. BPU is a public utility, owned by Defendant Unified Government, which provides electricity and water to approximately 66,000 customers in Wyandotte County and Johnson County, Kansas. BPU regularly conducts business in the state of Kansas and may be served by serving the Unified Government Clerk, Brett Deichler, at 710 N. 7th Street, Suite 323, Kansas City, Kansas 66101.

4. At all times relevant hereto, Plaintiff was an employee of BPU and enjoyed the protections accorded her in 42 U.S.C. §1981.

5. At all times relevant hereto, Defendant Unified Government is an employer governed by 42 U.S.C. §1981.

6. On information and belief, Defendant Unified Government employs (and at all times relevant hereto has employed) more than 200 employees.

7. Both jurisdiction and venue are proper in this court. This Court has original subject matter jurisdiction over all of Plaintiff's federal causes of action under 42 U.S.C. §1981. All unlawful employment practices and all other transactions and occurrences alleged herein were committed within Kansas.

8. Plaintiff seeks damages in excess of $75,000.00, exclusive of costs.

**FACTUAL BACKGROUND OF PLAINTIFF'S CLAIMS**

9. Plaintiff hereby incorporates paragraphs 1 through 8, and those that follow, by reference, as if fully set forth in these factual allegations.

10. Plaintiff is an African American.

11. Plaintiff began working for BPU as a contract employee in 2012 and then a full-time employee in 2013. Plaintiff began her full-time employment as a customer service representative and then transferred to the water treatment plant as an operator, working her way

up to a Senior System Operator.

12. Plaintiff has witnessed and experienced discrimination and harassment due to her race. But for her race, Plaintiff would not have experienced discrimination; Plaintiff's race is the "but for cause" of the discrimination alleged herein.

13. Plaintiff was verbally accosted by an employee during her initial walkthrough of the Water Plant. During an introduction, Plaintiff was told "you gotta be a fucking NASA scientist to work here, girl." The manager, Steve Nirschl, laughed in response.

14. Nirschl generated and circulated a rumor that Plaintiff's mother (a former employee of BPU) had written Nirschl an email, asking Nirschl to hire Plaintiff. The rumors persisted until Nirschl was confronted and asked to produce the email.

15. Other operators would make racial and sexual comments that prompted Plaintiff to make complaints to her supervisor, Nirschl. The operators would talk badly about transgendered employees, as well as stating they would not donate to the United Way because they didn't "give to people like that," insinuating people of color. Nirschl told Plaintiff that employees were allowed to make racial comments about other minorities, as long as it wasn't about Plaintiff's race.

16. In September 2017, Nirschl accused Plaintiff of cursing at him, claiming Doug Miller was a witness to the event. Immediately thereafter, rumors spread that Plaintiff was going to be written up. Nirschl went outside of management and discussed Plaintiff's "personnel issues" with other employees. Plaintiff went to Nirschl, asking why other employees knew of her "personnel issues." Nirschl offered to contact Human Resources and Plaintiff agreed, and a meeting was scheduled.

17. Plaintiff believed the meeting with Human Resources was to address Nirschl discussing personnel issues with other employees. Instead, Human Resources wanted to write-up Plaintiff. Plaintiff was to receive one week's suspension and placed on one year's probation.

18.     Plaintiff contested, and required a Union grievance to remove the documentation from Plaintiff's personnel file. During the grievance, Nirschl admitted he "could not remember what was said," and the write-up was withdrawn. Nevertheless, Plaintiff was given a verbal warning.

19.     After that, Plaintiff suffered retaliation for engaging in protected activity.  Her personal items were stolen from her work cabinet.   Coworkers were not allowed to help Plaintiff, but were permitted to help other employees. Plaintiff's badge was also deactivated in November 2017.

20.     In February 2018, Plaintiff was called to Human Resources and written up for "threatening, intimidating, harassing, coercing, or interfering with another while on utility premises or during working hours." The write up called for one week suspension and one year probation. Plaintiff filed a grievance and was told that the write up would be removed, but that management wanted a memorandum placed in her personnel file.   This retaliation was part of an ongoing hostile environment.

21.     On February 23, 2018, Plaintiff submitted a letter of concern for personal safety to Sam DeLeon and Ashley Culp, both in Human Resources. Plaintiff stated that she felt under personal attack in her workplace and that she was being targeted by management and compliant employees. Plaintiff stated that she lived "in a constant state of anxiety," which she believed was "an intentional tactic."

22.     On July 16, 2018, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") (dually filed with the Kansas Human Rights Commission) alleging race discrimination, color discrimination, sex discrimination, disability discrimination, and retaliation. Shortly after filing her Charge of Discrimination, Defendant suddenly started hiring minorities.

23. On July 24, 2018, Plaintiff went to the lunchroom to wash out her lunch dishes and after turning on the sink, the water shot from the spray nozzle instead of the tap. After inspecting the hardware, Plaintiff discovered that the spray nozzle was rigged with tape and was aimed upward. Plaintiff submitted a complaint to Nirschl in addition to Human Resources and her Union Representative that same day.

24. In August 2018 (approximately), Plaintiff applied for the ECC Operators position. After Plaintiff submitted two written inquiries as to the status of her application, Ashley Culp responded that Plaintiff did not meet the experience requirement for the position. Plaintiff responded, detailing her experience history and stated that she did not see any requirements that she did not meet. Culp replied that she would forward Plaintiff's email to the Director and Supervisor to "see if they [would] reconsider [Plaintiff's] application." Plaintiff eventually received an interview, but did not receive the position. Nirschl had previously mentioned that he "knew people" in that department.

25. On February 6, 2019, Plaintiff was instructed by Nirschl to adjust chemical ratios, without offering any reason and/or inquiry into Plaintiff's observations or opinions. Plaintiff performed the task as assigned because she was afraid of being written up for insubordination. That same day, Tammy Torrez from Human Resources requested that Plaintiff be present for a meeting because another employee "had an issue" with Plaintiff.

26. In February 2019, Torrez had initiated an investigation concerning the complaints against Plaintiff. Plaintiff was offered counseling for her "anger issues" by Tammy Torrez in Human Resources.

27. On March 8, 2019, Torrez told Plaintiff she needed to talk to her, since Plaintiff had been a witness to an incident in Ottawa. Plaintiff asked about the status of the investigation of the "charges" against her, and Torrez said the investigation was closed and that Torrez would send

an email to Plaintiff saying such. Torrez also said that she had read the claims that Plaintiff submitted to Human Resources and that Plaintiff needed to submit additional information.

28. On March 15, 2019, Plaintiff was not told by management that another employee was to be "stepped up" into the operator position. Plaintiff had been previously reported to Human Resources for not allowing a junior operator to step up. Plaintiff left the control room to find Doug Miller to confirm that the other employee was to be stepped up. After confirming, Plaintiff returned to the control room. Plaintiff ended up having to leave her shift early due to suffering an anxiety/panic attack at work.

29. On June 30, 2019, a coworker, Joe Bolz, spoke with Plaintiff and used the n-word and asked if he "sounded like one." Plaintiff was appalled and shocked.

30. Throughout Plaintiff's employment in Operations, there were ongoing issues relating to equipment failure or maintenance. Plaintiff would report the issues, but other employees would attempt to undermine Plaintiff's reports by saying the equipment would work fine or did not need repair.

31. Employees would also undermine Plaintiff by failing to accurately report counts and failed to be specific on relief reports.

32. Nirschl changed the work schedules for other employees as desired or requested but would not accommodate Plaintiff's schedule requests for her schooling. Plaintiff was also prevented from obtaining overtime.

33. On July 16, 2019, Plaintiff was called into Nirschl's office and asked if Plaintiff still wanted the Lab Tech/Hybrid job because she was next in line. Plaintiff said yes and had an interview scheduled for July 19, 2019.

34. Plaintiff attended her interview on July 19, 2019 with Nirschl and Daggett. Plaintiff was offered, and accepted, the position.

35. On July 24, 2019, Plaintiff met with Nirschl, Kristina Daggett, and Ashley Culp (Human Resources) to discuss the new position, including pay. Plaintiff was started at the lowest level of pay for the position, despite Plaintiff's education and background with Defendant.

36. On August 1, 2019, Plaintiff took a demotion of almost $40,000.00 annually in an attempt to remove herself from management's crosshairs and alleviate tensions.

37. Plaintiff continued to be harassed and discriminated against, even after her voluntary demotion. Plaintiff was moved from plant to plant, which interfered with proper training. After making chemical changes at the power plant, Doug Miller suggested Plaintiff did not know what she was doing, and later said if Plaintiff did not pass an assessment of her abilities to do a chemical regeneration on her own, there would be issues. However, it was never specified what that meant.

38. On October 9, 2019, Kristina Daggett asked Plaintiff to log into the computer at 3:29 p.m. Plaintiff asked if she was getting overtime (due to prior threats of not being given overtime). Kristina said that she would just log Plaintiff out. Plaintiff declined and Daggett seemed annoyed and upset at Plaintiff. Plaintiff clocked out at 3:33 p.m.

39. Plaintiff did not receive appropriate training and had to train herself in her new position.

40. In December 2019, Plaintiff inquired about changing the working hours for the lab to match the other employees within the water plant, which was a straight eight hour day with a thirty minute paid lunch. Everyone in management said they wanted to do this and when Nirschl heart it was Plaintiff that suggested it, it was shot down.

41. On December 19, 2019, Plaintiff followed up with Daggett to see if she had talked to Allen Dixon regarding changing the workday hours for the lab. Daggett said no and that she was instructed by Human Resources to leave it alone and "not touch it" because the decision could

not be made by her. Daggett also said that it would have to be negotiated by the Union and that it would affect distribution. Plaintiff told Daggett that was incorrect, that each department has their own rules, and that it was weird Management could implement any rules they want and negotiate it later, but the employees could not.

42. In March and April 2020, Plaintiff contracted Covid-19. Plaintiff was off work for almost one month. After difficulties in receiving paid administrative leave, as well as having to use her personal sick leave and vacation leave, Plaintiff never received the requested documentation concerning the paid leave offered by Defendant. Additionally, Plaintiff did not receive holiday pay as she previously received and was shorted on her earned vacation leave for the upcoming year due to Plaintiff not working 96 hours in the past month. This was corrected and paid to Plaintiff upon her final paycheck from Defendant.

43. Plaintiff had applied for multiple positions that she was qualified for, including the Superintendent of Operations. The position was awarded to Caucasian male Brian Downing who was less than qualified than Plaintiff. Downing had even made a comment after a United Way meeting that we "don't give to people like that." Plaintiff interpreted this comment to be derogatory and discriminatory towards minorities of poor economic status.

44. Because her conditions of employment were so intolerable that a reasonable person could no longer work under the existing conditions, Plaintiff was constructively discharged and resigned from her job, giving a two-week notice, effective as of September 30, 2020. In her resignation letter, Plaintiff pointed out her prior complaints and the fear of others to voice complaints for fear of retaliation.

45. Plaintiff specifically described recent promotions of individuals that have actively participated in discriminatory conduct, including Steve Nirschl, Doug Miller, and Brian Downing. These actions were brought to the attention of Human Resources – both the "old" and the "new"

Human Resources (there had been turnover in HR) – and every time the complaints were ignored.

46. Dennis Dumovich, the director of Human Resources, contacted Plaintiff the day after receiving her resignation letter, asking Plaintiff's permission to launch an investigation and requesting a meeting to discuss the allegations mentioned in Plaintiff's resignation letter.

47. Plaintiff declined the invitation to discuss her reports of discrimination because investigations in the past were not handled appropriately, and Plaintiff was often pinpointed as "the issue" and the true perpetrators were not disciplined.

48. Plaintiff's husband, a white male, is still an employee at Defendant BPU and continues to be harassed and discriminated against simply for being married to a black woman.

## COUNT I
## RACE DISCRIMINATION/RETALIATION/HOSTILE WORK ENVIRONMENT
## IN VIOLATION OF 42 U.S.C.§1981

49. Plaintiff hereby incorporates by reference all previously stated allegations in ¶¶ 1 through 45 above.

50. The continuing series of events planned and carried out by Defendant Unified Government, as described above, are discriminatory, abusive, and harassing. But for her race, Plaintiff would not have experienced the discrimination, abuse and harassment described above.

51. Defendant's misconduct, as alleged above, constitutes racial discrimination and retaliation in violation of 42 U.S.C. § 1981.

52. But for her race, Plaintiff would not have been treated differently; her race is a "but for" causative factor.

53. The actions of Defendant described above had a materially adverse impact on Plaintiff. As a direct and proximate result of the discriminatory conduct of Defendant, Plaintiff has suffered actual damages in the form of lost wages and benefits, humiliation, emotional distress and embarrassment in excess of $75,000.00.

54. The actions of Defendants Unified Government, BPU, and its employees have been willful, and in reckless disregard for the rights of Plaintiff. As a result, Plaintiff is entitled to actual and punitive damages.

55. Plaintiff is entitled to all actual damages, and to punitive damages, in such amounts as will be proven at trial and found to be reasonable by a jury.

56. If Plaintiff prevails on her claim, she is entitled to recover all attorneys' fees, costs, and expenses as provided by law.

WHEREFORE, Plaintiff prays for judgment, after jury trial, awarding her all actual damages deemed fair and reasonable by the jury; for punitive damages in such amount as is deemed fair and reasonable by the jury; for all attorneys' fees, costs and expenses incurred by plaintiff; and for such other equitable relief as the court deems just and proper.

## PLAINTIFF'S DEMAND FOR JURY TRIAL

Plaintiff hereby requests and demands a trial by jury on all issues so triable.

## DESIGNATED PLACE OF TRIAL

Plaintiff, by and through counsel, hereby designates the United States District Court for the District of Kansas at Kansas City as the place of trial.

Respectfully submitted,

**THE POPHAM LAW FIRM, P.C.**

By: /s/ Bert S. Braud  
Bert S. Braud, KS Bar No. 14223  
712 Broadway, Suite 100  
Kansas City, Missouri   64105  
Telephone:     (816) 221-2288  
Telecopier:    (816) 221-3999  
E-Mail:        bbraud@pophamlaw.com  

**ATTORNEYS FOR PLAINTIFF**