# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **ALEXANDRA BRADLEY,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:23-CV-2088-JAR** |
| **UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS, as representative of Kansas City Board of Public Utilities,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Plaintiff Alexandra Bradley brings this action under 42 U.S.C. § 1981 against Defendant Unified Government of Wyandotte County/Kansas City, Kansas ("UG"), as the representative of the Kansas City Board of Public Utilities ("BPU").  Plaintiff raises claims of race discrimination, retaliation, and hostile work environment arising out of her employment with the BPU.  This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 38).  The motion has been fully briefed, and the Court is prepared to rule.  As described below, the Court grants the motion.

## I.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact

---

[1] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a

---

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

rational trier of fact could find for the nonmovant."[10]  The facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[11]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[12]

## II.   Uncontroverted Facts

The following material facts are uncontroverted,[13] stipulated to for the purposes of summary judgment, or viewed in the light most favorable to Plaintiff.

Defendant is a municipal corporation organized and existing under the laws of the State of Kansas.  The BPU is an administrative agency of the UG.  The BPU provides electricity and water services to Wyandotte County and part of Johnson County, Kansas.  The BPU's General Manager is William Johnson.

Plaintiff is African-American.  Plaintiff began her employment for the BPU on April 25, 2013.  From 2014 until September 1, 2019, Plaintiff worked in the BPU's Water Operations Division.  Plaintiff worked at the Nearman Water Treatment Plant ("NWTP") and reported to Steve Nirschl, the Superintendent of Operations and Maintenance.  All of Plaintiff's positions at the BPU were union positions under IBEW Local 53.

Plaintiff testified that, when she started work at the NWTP, there was a picture of President Obama on a bulletin board that depicted him as a monkey.  Plaintiff testified that the

---

[10] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[11] *Adams*, 233 F.3d at 1246.

[12] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[13] Defendant challenges many of Plaintiff's facts about the environment at the NWTP as either inadmissibly hearsay, or as insufficiently specific.  The Court need not rule on these objections because, even assuming those facts are admissible, Defendant is entitled to summary judgment.

picture was taken down when Derek Vann, an African-American man, was hired.  Nirschl testified that he does not recall this cartoon.  Plaintiff testified that many of her coworkers made offensive comments about Mexican people, Jewish people, and LGBTQIA+ people, and that she broke down crying because of these kinds of statements.  Plaintiff testified that Joe Bolz and Brian Downing said "Jewish people are stingy" and that Mexican people were "stealing the jobs" and were dirty.[14]  Plaintiff also testified about a United Way presentation which depicted several photos of poor, African-American people, and sought donations.  Plaintiff testified that a coworker, Brian Downing, stated that he did not "give to people like that."[15]  Plaintiff also testified that Doug Miller referred to Black people as dumb.

Plaintiff's coworkers stole items from her work cabinet in August 2016 and May 2017.  Plaintiff sent emails complaining of the thefts to Nirschl.  When Plaintiff put a note on her cabinet asking people not to take her things, Nirschl took it down.  Nirschl never investigated the thefts.  Once, after Plaintiff returned to work from a sick leave, she asked for help from a coworker but Nirschl told her the coworker was busy with other work.  Plaintiff testified that it was "extremely unusual."[16]  Additionally, Plaintiff wanted to trade shifts to take classes for a certification, but management refused, forcing Plaintiff to use a week or two of vacation time.  When a coworker, Cody Isbell, took the same courses, the schedules were changed for him.  Other operators were also allowed to trade shifts, including Downing and O'Brien.  Isbell, Downing, and O'Brien are all White.  Plaintiff also recorded in her journal that operator Jason Matthews, who is Black, was allowed to change his schedule.  Plaintiff testified that shift

---

[14] Doc. 42-2 at 232:08–22.

[15] *Id.* 60:18–20.

[16] *Id.* 74:14–75:03.

coverage at the NWTP "depended a lot on the will of Steve Nirschl" and assignments depended on "who you were."[17]

In September 2017, Nirschl issued a conduct memorandum to HR which accused Plaintiff of cursing at him.  The policy at the BPU is that a manager initiates a conduct memorandum, but HR sets the discipline, and the discipline indicated on the conduct memorandum was a second warning and 180 days of probation.  Only the General Manager, or his or her designee, has the authority to discharge an employee.  A verbal warning was issued to Plaintiff on October 10, 2017 about the incident.  Plaintiff grieved the incident through her union and the punishment was downgraded to a lesser verbal warning.  Ultimately, no documents were placed in Plaintiff's file about the incident.  Sometime in November 2017, Plaintiff's badge was deactivated; it was recommissioned within a day.  On November 13, 2017, Plaintiff filed an internal complaint asserting that she was being targeted by management and employees.

In 2017, Nirschl brought in an outside consultant, Sandy Brown, to meet with the operations team at the NWTP to address complaints about the work environment.  Nirschl testified that employees had complained about Plaintiff being difficult to work with throughout her employment, and that complaints about Plaintiff were the majority of the reason he brought in Brown.  In February 2018, Jason Matthews told Nirschl that putting a new person with Plaintiff was difficult for the new employee because Plaintiff was "extremely negative."[18]  Matthews also told Nirschl that Plaintiff called people at the BPU "racists, sexist, bigots."[19]

---

[17] *Id.* 26:3–27:8.

[18] Doc. 42-19 at 2.

[19] *Id.*

That same month, Plaintiff's coworkers Derek Vann and Ashley Galvan both reported to Nirschl that Plaintiff called Vann "F-ing weak" during a shift change on February 15, 2018.[20] Plaintiff and Vann had been discussing overtime and the fact that other operators were not trading shifts with Plaintiff. Nirschl issued Plaintiff a conduct memorandum about the incident, which accused her of "[t]hreatening, intimidating, harassing, coercing or interfering with" an employee.[21] The conduct memorandum listed the discipline as a one-week suspension and one-year probation. Plaintiff grieved the second conduct memorandum through her union as well. After the grievance process, the conduct memorandum was removed from her file and the discipline was downgraded to a formal warning. Nirschl has disciplined other employees for cursing or using inappropriate language at work.

After the incident with Vann and before Plaintiff received the conduct memorandum, Plaintiff wrote a "Letter of Concern."[22] The letter listed the addressee as "whom[ever] it may concern."[23] In the letter, Plaintiff expressed concerns about her personal safety and the work environment, but did not explicitly mention race or discrimination based on race. She mentioned that rumors were being spread that she was "in some way dangerous or unstable."[24] Other employees like Isbell circulated these rumors about Plaintiff being dangerous, to the point that Isbell had to keep a piece of furniture between the two of them. Plaintiff's letter alleged that coworkers were following her outside of work and stealing things out of her personal work cabinet. The letter further stated that coworkers and management "have lied on me, harassed me,

---

[20] Docs. 39-5, 39-6.

[21] Doc. 39-3.

[22] Doc. 39-7 at 1.

[23] *Id.*

[24] *Id.*

discriminated against me, and now I am dealing with physical intimidation."[25]  The letter

described a second encounter with Vann, where he looked at her in a way that made her feel like

he was going to hit her.  At the end of the letter, Plaintiff requested that a third party be present at

every shift change because she did not feel comfortable.  The BPU fulfilled Plaintiff's request

and brought in security guards for each shift change.

On July 16, 2018, Plaintiff filed a Charge of Discrimination with the Kansas Human

Rights Commission, alleging discrimination on the basis of race, color, sex, disability, and

retaliation.  She specifically named Nirschl and Johnson, along with other members of

management, as having mistreated and discriminated against her based on her race.  That same

month, on July 24, 2018, Plaintiff went to clean her dishes in the NWTP lunchroom but someone

had taped down the spray nozzle of the sink so that it sprayed her when she turned it on.

Plaintiff had a late lunch that day and everyone else had already eaten, so no one else would have

used the sink.  Plaintiff went to management and the union about the spray nozzle incident.  Two

days later, Nirschl issued a memorandum reminding all NWTP employees to refrain from

horseplay, per the employee handbook, but did not refer to the sink incident.  Sometime in 2018,

Nirschl was promoted to Director of Water Production.

Galvan complained to Nirschl about Plaintiff again in December 2018, and Nirschl called

HR Compliance Coordinator Tammy Torrez on December 24, 2018.  Torrez interviewed Galvan

that same day, and Galvan complained about Plaintiff's behavior over the entire year.  Galvan

stated that Plaintiff ignored less-senior water operators during shift changes, and that no one

wanted to work with Plaintiff.  Galvan reported that coworkers avoid the control room when

Plaintiff is in there, and that everyone feels like they are walking on eggshells around her.

---

[25] *Id.* at 2.

Galvan also stated that operators felt uncomfortable talking to their union representative at the plant, Seth Bradley, because he was dating Plaintiff.  Galvan accused Plaintiff of creating a hostile work environment, and noted that "[i]t feels like [Plaintiff] is always trying to file a grievance on [Nirschl]."[26]

Torrez opened an HR investigation into the allegations against Plaintiff.  On December 31, 2018, Torrez interviewed James Bryant, who is African-American.  Bryant stated that Plaintiff is disrespectful of Nirschl, and generally negative, belittling, and difficult.  Bryant stated that he tried to talk to Nirschl about it but that he felt Nirschl was afraid of Plaintiff.  On January 2, 2019, Torrez interviewed Brian Downing, who reported that he had been in operations for the longest period of time and that Plaintiff was a problem.  Downing stated that Plaintiff was disrespectful of Bryant, who was new and being trained.  Downing stated that he thought Plaintiff was "doing things outside of the parameters" but that Nirschl "said he did not want to speak with her because it would lead to a fight."[27]  Downing told Torrez that technicians avoided the control room if Plaintiff was there because Plaintiff is "so aggressive and angry."[28]  Torrez also interviewed Sarah Hoffman on January 2, 2019, who stated that she had seen Plaintiff disrespect Nirschl.  Hoffman also stated that "[e]veryone is always on their guard"[29] around Plaintiff and that most people avoid her.

On January 7, 2019, Torrez interviewed Isbell, who stated that operators work well together and the "only person who has had issues is [Plaintiff.]"[30]  That same day, Torrez

---

[26] Doc. 39-11 at 3.

[27] Doc. 39-13 at 1.

[28] *Id.* at 2.

[29] Doc. 39-14 at 1.

[30] Doc. 39-15 at 1.

interviewed Matthews, who identified Plaintiff as "a problem."[31]  The Control Room at NWTP

has an operators chair that operators sit in while working.  There is a "step up" process where

lower level employees can work at the senior level and receive higher pay, but Matthews states

that Plaintiff refused to allow him to step up and take over her chair, even after Nirschl asked her

twice.  Matthews further stated that Plaintiff "does have people scared," and that he stopped

talking to her because he thought "she may try to use it against [him]."[32]  Finally, Torrez

interviewed Vann on January 9, 2019.  Vann discussed the earlier shift change incident, noting

that Plaintiff "was calling me fucking weak; she said I had a band of brothers."[33]  Vann also told

a story about Plaintiff yelling at Isbell, where Plaintiff stated "he's only doing this because I have

a vagina."[34]

On February 6, 2019, Nirschl asked Plaintiff to adjust chemical ratios.  Nirschl had asked

Plaintiff to do that before, but not daily, and Plaintiff testified that such requests were out of the

norm.  That same day, Torrez asked for a meeting with Plaintiff.  Torrez asked Plaintiff about

some of the reported incidents, and Plaintiff stated that she had "no disagreement with her

coworkers."[35]  Torrez offered classes to Plaintiff on communication skills.  Plaintiff filed an

Amended Charge of Discrimination the next day, adding a new allegation of retaliation by

"unwelcome acts of ostracism and/or unwarranted criticism."[36]  On February 20, 2019, Nirschl

held a mandatory meeting "to address conflict in the workplace and improving communication

---

[31] Doc. 39-16 at 1.

[32] *Id.* at 1–2.

[33] Doc. 39-17 at 1.

[34] *Id.*

[35] Doc. 39-19 at 1.

[36] Doc. 39-20 at 2.

skills."[37]  On March 15, 2019, Plaintiff did not allow Matthews to step up into her chair for the second time.  Plaintiff told Nirschl that she was not informed that Matthews would be stepping up that day.

On June 30, 2019, Plaintiff's White coworker, Joe Bolz, used the n-word in a conversation with her by asking her if he "sounded like a n****r."[38]  Plaintiff did not tell anyone about the comment and did not report Bolz or the incident to supervisors.  Plaintiff testified that she did not report the incident because "th[at] kind of language was not abnormal."[39]  Plaintiff testified that Bolz also yelled at and physically intimidated two other employees.

Plaintiff applied for a newly-created hybrid position—Relief Lab Tech—on March 22, 2019.  The Relief Lab Tech position entailed working at, and transitioning between, the laboratories at NWTP and the BPU's power plant.  Another person got the position, but moved back to their prior job within 30 days, as permitted by BPU rules.  Plaintiff was then awarded the position because she had the next-highest seniority of the bidders, and began on September 1, 2019.[40]  In her hybrid position, Plaintiff's supervisor was Kristina Daggett.  Plaintiff had no issues with Dagget.  Plaintiff described the other lab techs she worked with in the hybrid position

---

[37] Doc. 39-21.

[38] Doc. 39-2 at 137:6–11.  Defendant challenges the admissibility of this statement on hearsay grounds, but presents no argument beyond that.  Defendant presents no contrary evidence, such as a declaration from Bolz stating that he did not say the n-word.  The Court overrules Defendant's objection because Plaintiff could testify at trial about the conversation, and Bolz's statement could be admitted for the purpose of showing the racial attitude of the workplace.  *See Powell v. Laborers Union No. 1271*, 426 F. App'x 615, 621 (10th Cir. 2011) ("Since the comments were relevant for the racial attitudes they revealed and not for the truth of any factual assertions, they were not hearsay." (collecting cases)).

[39] Doc. 39-2 at 138:15–16.

[40] Both parties inconsistently refer to Plaintiff's start date for the hybrid position.  However, the parties stipulated to the fact that Plaintiff began the new position on September 1, 2019, in the Pretrial Order.  Doc. 37 at 2.

as "great and very helpful.  Very nice."[41]  Since Nirschl had been promoted to Director of Water Production, Plaintiff was still within Nirschl's chain of command after the transfer.

Plaintiff took a pay cut when she transferred.  Plaintiff's salary in the hybrid position was set by the IBEW Local 53's Clerical Agreement and was the starting step (step 1) out of five steps for that position.  The IBEW Local 53 has two union agreements at the BPU, the clerical and the physical.  All of Plaintiff's positions at the BPU fell under the physical agreement except for the hybrid lab tech position; thus, when Plaintiff transferred to the hybrid position, she moved to the clerical agreement.  It is the BPU's longstanding practice that employees starting a new union position move to the step 1 pay for that position.  Plaintiff knew she would be paid less in the hybrid position when she applied, but was never told that there was a practice of assigning the lowest pay scale to a transferred employee.  Plaintiff testified that she did not know she would be started at the lowest pay scale until the position was offered to her, but that she wanted to transfer to escape the challenging work environment in her prior role.

After she transferred positions, Plaintiff's pay changed from $45.39/hour to $33.83/hour, a 25.47 percent decrease.  Plaintiff did not file a grievance about her pay in the hybrid position. Between 2018 and 2023, four White employees had a pay decrease larger than Plaintiff's, by percentage, when moving to a new union position at the BPU.  In the same time period, seven White employees had a pay decrease of over twenty percent when moving to a new union position at the BPU.  Regarding her time in the hybrid position, Plaintiff testified that she did not receive enough training.  Plaintiff also testified that some of her pay was delayed, but was ultimately paid in full, and that she was denied sick leave at some point.

---

[41] Doc. 39-2 at 162:7–11.

Plaintiff eventually applied for a newly created position at the NWTP—Superintendent of Water Operations—but Downing received the promotion on July 18, 2020.  Plaintiff testified that Downing was less qualified than her because she had more education, was a better operator than him, and because she had more experience.  Plaintiff was told that Downing was hired because he had more experience in water operations.  Downing had worked in water operations for 11 years, and Plaintiff had worked in water operations for around five and a half years.

Plaintiff resigned from the BPU effective September 30, 2020.  In Plaintiff's resignation letter, she stated that she "c[ould] no longer tolerate the abuse and continued harassment."[42]  She compared Nirschl's mistreatment of her to BPU's mistreatment of other employees, including a former White employee, Steve Gardner, who she claimed committed suicide.  Plaintiff later testified that "most everybody" she worked with "felt like they were in a toxic environment," for their own reasons.[43]  The BPU's HR Director responded to Plaintiff's resignation letter stating that he was sorry to see her go, and requested dates for an exit interview to launch an investigation into her complaints.  Plaintiff responded, "I do not have the time to meet with you to discuss my resignation letter," and that she had "no interest in being party to this sham" investigation.[44]

## III.  Discussion

"'Section 1981—which declares that all persons shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens—prohibits . . . racial discrimination' in the workplace."[45]  Plaintiff raises three claims against Defendant under § 1981: (1) race

---

[42] Doc. 42-9 at 2.

[43] Doc. 39-2 at 183:9–15.

[44] Doc. 39-31 at 1.

[45] *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015) (alterations in original) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 354–55 (2013)).

discrimination; (2) retaliation; and (3) hostile work environment.  Below, the Court first resolves the dispute between the parties about which evidence the Court may consider in its analysis of each claim.  The Court then articulates the burden-shifting standard that applies to the race discrimination and retaliation claims, and then analyzes each claim to determine whether there is a genuine dispute of material fact that precludes summary judgment.  As described below, the Court finds that Defendant is entitled to summary judgment.

A.       **Statute of Limitations**

Defendant asserts that the majority of Plaintiff's allegations fall outside the four-year statute of limitations for § 1981 claims.  Plaintiff filed this action on March 2, 2023; thus, Defendant asserts that the Court cannot consider any allegations prior to March 2, 2019.  Plaintiff does not dispute the fact that the four-year statute of limitations applies, but argues that the continuing violation doctrine permits the Court to consider allegations from before March 2, 2019.  Defendant replies that the continuing violation doctrine does not apply because the work environment changed significantly after Plaintiff's transfer, and thus the violations could not "continue."

The Court finds that it may consider allegations outside of the statute of limitations only in its analysis of Plaintiff's hostile work environment claim.  The Supreme Court considered the application of the continuing violation doctrine to claims of racial discrimination, retaliation, and hostile work environment under Title VII in *National Railroad Passenger Corp. v. Morgan*.[46]  The Supreme Court declined to apply the continuing violation doctrine to discrimination and retaliation claims, noting that "[e]ach incident of discrimination and each retaliatory adverse

_____

[46] 536 U.S. 101 (2002).

13

employment decision constitute[] a separate actionable 'unlawful employment practice.'"[47] However, the Court explained that hostile work environment claims are "different in kind" from other unlawful employment practices like failure to promote or discriminatory termination, because "[t]he 'unlawful employment practice' . . . cannot be said to occur on any particular day."[48]  The Supreme Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period."[49]

The Tenth Circuit later applied the *Morgan* rule to hostile work environment claims arising under § 1981, noting that *Morgan* "simplified the law by allowing courts to view allegations of hostile work environment as a single unlawful employment practice."[50]  The Tenth Circuit cautioned that plaintiffs could only take advantage of the expanded scope of hostile work environment claims if they cleared "the formidable hurdle of proving that the alleged acts constitute part of the same hostile environment."[51]

Here, if Plaintiff can establish that the challenged acts before March 2, 2019 constitute part of the same hostile environment as the challenged acts post-March 2, 2019, the Court may consider the entirety of the allegations as part of a single unlawful employment practice for Plaintiff's hostile work environment claim.  However, with respect to Plaintiff's discrete claims for race discrimination and retaliation, the continuing violation doctrine does not apply.  Notably,

---

[47] *Id.* at 114 (quoting 42 U.S.C. § 2000e-5(e)(1)).

[48] *Id.* at 115 (quoting 42 U.S.C. § 2000e-5(e)(1)).

[49] *Id.* at 105.

[50] *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1154–55 (10th Cir. 2008) (quoting *Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002)).

[51] *Id.* at 1154.

Plaintiff fails to mention her discrimination and retaliation claims in her discussion of the continuing violation doctrine; she references only the hostile work environment claim. Therefore, in its analysis of Plaintiff's race discrimination and retaliation claims, the Court considers only discrete allegations that fall within the four-year statute of limitations.

### B.    Race Discrimination and Retaliation Claims

A plaintiff alleging race discrimination or retaliation under § 1981 may prove intentional discrimination either through direct statements indicating a discriminatory motivation or through circumstantial evidence.[52]  Here, Plaintiff asserts that she presents direct evidence of discrimination.  However, as described below, the Court finds that Plaintiff presents only circumstantial evidence of race discrimination and retaliation.  Thus, the familiar *McDonnell-Douglas*[53] burden-shifting framework applies.[54]

Plaintiff must first submit evidence from which a reasonable jury could conclude that a prima facie case of discrimination or retaliation has been established.[55]  Defendant must then articulate a "legitimate, nondiscriminatory reason" for its action.[56]  If Defendant does so, the burden shifts back to Plaintiff to identify evidence from which a reasonable jury could conclude that the proffered reason is actually pretext designed to mask discrimination or retaliation.[57] Although the burdens of production shift, the ultimate burden of persuading the trier of fact that

---

[52] *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1225 (10th Cir. 2000) (citing *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir. 1999)).

[53] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[54] *Kendrick*, 220 F.3d at 1225–26 ("While *McDonnell Douglas* involved a Title VII claim for failure to hire, the analytical framework it pioneered applies equally to claims brought pursuant to section 1981." (quoting *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999))).

[55] *McDonnell Douglas*, 411 U.S. at 802.

[56] *Id.*

[57] *Id.* at 804.

Defendant intentionally discriminated or retaliated against Plaintiff remains at all times with Plaintiff.[58]

### 1.    Race Discrimination

"[I]n racial discrimination suits, the elements of a plaintiff's case are the same . . . whether that case is brought under §§ 1981 or 1983 or Title VII."[59]  To establish a prima facie case of race discrimination under § 1981, a plaintiff must show "(1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees."[60]  "An adverse employment action need not cause significant, material, or serious injury to be actionable.  But there must be some 'disadvantageous change in an employment term or condition.'"[61]  Additionally, under § 1981, "a plaintiff bears the burden of showing that race was a but-for cause of its injury."[62]  This but-for cause requirement is different than Title VII's "motivating factor" causation standard.[63]

Defendant concedes that Plaintiff is a member of a protected class, but argues that she suffered no adverse employment action and was not treated less favorably than others not in her protected class.  Plaintiff offers many examples of actions that allegedly constitute adverse employment actions.  As discussed above, the Court considers only factual allegations after March 9, 2019 in Plaintiff's race discrimination claim.  The discrete actions Plaintiff challenges

---

[58] *See Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1278 (10th Cir. 2010) ("Throughout the three-step process, '[t]he plaintiff . . . carries the full burden of persuasion to show that the defendant discriminated on [an] illegal basis.'" (alterations in original) (quoting *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005))).

[59] *Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991) (citations omitted).

[60] *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1168 (10th Cir. 2018) (quoting *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005)).

[61] *Harris v. U.S. Dep't of Veterans Affairs*, No. 22-2489-HLT, 2024 WL 3010879, at *10 (D. Kan. June 14, 2024) (citation omitted) (quoting *Muldrow v. City of St. Louis*, 601 U.S. ---, 144 S. Ct. 967, 974 (2024)).

[62] *Comcast Corp. v. Nat'l Assoc. of African Am.-Owned Media*, 589 U.S. 327, 333 (2020).

[63] *Id.* at 337–40 (discussing the differences between Title VII and § 1981's causation standards).

after March 9, 2019 are: Bolz's use of the n-word in a conversation with her; her lower pay in the hybrid position; the denial of a promotion to Director of Water Operations; lack of sufficient training in the hybrid position; delay in pay; denial of leave; and constructive discharge.  Plaintiff presents no argument about why any of the above actions constitute an adverse employment action.  Nonetheless, the Court considers whether any of these actions could constitute an adverse employment action, and if so, whether Plaintiff can make a showing of pretext.

### a.    Bolz's Racist Comment

Beginning with Bolz's use of the n-word, the Court finds that it does not constitute an adverse employment action.  Though his comment was reprehensible and undoubtedly racist, Bolz was a coworker of Plaintiff's and had no authority over the terms and conditions of her employment.  Nor does Plaintiff present any evidence that this comment impacted the terms and conditions of her employment.  Thus, the use of the n-word by a coworker, standing alone, cannot constitute an adverse employment action.

### b.    Training/Delay in Pay/Denial of Leave

Plaintiff's allegations about the lack of sufficient training in her hybrid position, a delay in pay, and a denial of leave are all insufficiently specific for the Court to find that they constitute adverse employment actions.  Regarding the lack of training, Plaintiff identifies no training that she should have received, but did not.  Regarding the delay of pay and denial of leave, Plaintiff provides no dates for when these actions occurred and no details about the harm she allegedly suffered.  "Speculative harm is insufficient [to constitute an adverse employment action], particularly when it is presented through conclusory allegations."[64]  The Court will

---

[64] *Harris*, 2024 WL 3010879, at *10 (citing *Cuenca v. Univ. of Kan.*, 265 F. Supp. 2d 1191, 1208 (D. Kan. 2003)).

consider these challenged actions in its analysis of the constructive discharge claim, but they do not independently satisfy the definition of an adverse employment action.

### c.  Hybrid Position Pay

Turning to Plaintiff's lower pay in the hybrid position, a 25% decrease in pay is a substantial change in the terms and conditions of employment which would ordinarily easily constitute an adverse employment action.  However, Plaintiff chose to transfer, even after learning of the salary difference.  Regardless, Plaintiff asserts that she was paid at a lower rate than the rate initially advertised when she applied.  Thus, the Court assumes without deciding that Plaintiff's low pay in the hybrid position constituted an adverse employment action, and that Plaintiff can satisfy the prima facie case for race discrimination based on her pay rate in the hybrid position.

The burden then shifts to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's pay decrease upon moving to the hybrid position.  Defendant asserts that it is the BPU's longstanding policy to start employees who transfer to a new Union agreement at the lowest pay scale step for the position.  Plaintiff did not controvert Defendant's factual allegations about the longstanding policy, and this reason is sufficient to carry Defendant's light burden.

The burden thus shifts back to Plaintiff to show that the proffered justification is pretextual.  "[A] plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are 'so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief.'"[65] Typically, a plaintiff attempts to demonstrate pretext in one or more of three ways:

---

[65] *Johnson v. Weld County*, 594 F.3d 1202, 1211 (10th Cir. 2010) (second alteration in original) (quoting *Hinds v. Sprint/ United Mgmt. Co.*, 523 F.3d 1187, 1197 (10th Cir. 2008)).

> (1) "[E]vidence that the defendant's stated reason for the adverse employment action was false"; (2) "evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances"; or (3) "evidence that the defendant acted contrary to an unwritten policy or contrary to [the employer's] practice when making the adverse employment decision affecting the plaintiff."[66]

Plaintiff asserts that Defendant's stated reason for her low pay rate is unworthy of belief because the position was posted at a higher pay rate than what was eventually awarded to Plaintiff. Plaintiff also challenges the truth of Defendant's longstanding practice by noting that the Clerical Agreement does not mandate a particular starting pay for employees bidding for a new job, or transferring to a new job. Plaintiff points to the "Promotions and Bidding" and "Transfers" sections of the Clerical Agreement, which do not mention any pay scale practice of starting transfers at the first pay step for a new position.[67]

As to Plaintiff's contention that the job was posted with a higher salary than she ultimately received, Plaintiff presents only her declaration as supporting evidence, which Defendant challenges as a "sham affidavit" and inadmissible hearsay. Defendant argues that Plaintiff's declaration summarizes the contents of a written document that was not provided, constituting classic hearsay. Defendant also notes that Plaintiff could not recall what salary the position was posted at during her deposition, calling into doubt her affidavit. As for Plaintiff's arguments against the veracity of its longstanding practice, Defendant notes that Plaintiff did not controvert its factual allegation that the practice exists. Defendant also asserts that its practice is confined to employees switching Union Agreements, not transfers within the same Agreements.

---

[66] *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014) (second alteration in original) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

[67] Doc. 39-28 at 21–22, 40.

Thus, Defendant notes that Plaintiff's arguments about the sections of the Clerical Agreement dealing with transfers to different positions covered by the Clerical Agreement are inapplicable.

The Court does not take a position on whether Plaintiff's affidavit is a "sham affidavit," but finds that there is no admissible evidence to support Plaintiff's allegation that the position was posted at a higher pay rate than she ultimately received.  Nor has Plaintiff controverted Defendant's evidence of its longstanding practice of starting employees who transfer to a different Union Agreement at the BPU at the lowest pay step.  At the summary judgment stage of the proceedings, "conjecture and bare allegations are not enough."[68]  Thus, Plaintiff fails to raise a genuine dispute of material fact on this claim because no reasonable jury could find that Defendant's reason for starting her at step 1 of the pay scale was pretext for unlawful discrimination.

### d.    Failure to Promote

The failure to promote Plaintiff to the Director of Water Operations position can constitute an adverse employment action.[69]  The Court assumes without deciding that Plaintiff can state a prima facie case for race discrimination based on Defendant's failure to promote her to the Director of Water Operations position.

Defendant easily satisfies its lenient burden to establish a non-discriminatory reason for its failure to promote Plaintiff.  Defendant asserts that it hired Downing for the position because he had more experience as an operator, and was still working as an operator whereas Plaintiff had transferred to a laboratory position.  Downing had 11 years of experience as an operator and Plaintiff had five and a half years of experience as an operator.  Defendant also noted that it

---

[68] *Ledbetter v. Unified Gov't of Wyandotte Cnty./Kansas City, Kan.*, No. 21-2502-TC, 2023 WL 6294867, at *6 (D. Kan. Sept. 27, 2023) (citing *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007)).

[69] *See Hillig v. Rumsfeld*, 381 F.3d 1028, 1032–33 (10th Cir. 2004)).

would have been the wrong decision to promote Plaintiff to supervise the same employees who had previously complained about her to Nirschl and HR.  These two reasons satisfy Defendant's burden to set forth a non-discriminatory reason for its failure to promote Plaintiff.

Plaintiff asserts that Defendant's non-discriminatory reasons are false because she had more experience that Downing, and alleges that Nirschl previously told her that she was a better operator than Downing.  Evidence that an employer's stated reason for an adverse employment action is false can support a finding of pretext.[70]  However, the Court finds that no reasonable juror could find that these assertions cast any doubt on Defendant's non-discriminatory reasons for promoting Downing.

First, it is uncontroverted that Downing had more experience than Plaintiff.  And, even if Nirschl did say that Plaintiff was a better operator than Downing (which he denies), Plaintiff has not shown that Nirschl was involved in the hiring process for the Director of Water Operations.  Moreover, the personnel complaints about Plaintiff still provided a non-discriminatory reason to select Downing over her.  Thus, even assuming that Plaintiff can satisfy the prima facie case for race discrimination based on a failure to promote, Plaintiff fails to raise a genuine dispute of material fact that Defendant's non-discriminatory reasons for failing to promote her were pretext for unlawful race discrimination.

### e.        Constructive Discharge

Finally, Plaintiff claims that she was constructively discharged from her job.  Constructive discharge can constitute an adverse employment action in a race discrimination

---

[70] *See Macon*, 743 F.3d at 714.

claim, but it is a demanding standard.[71]  To prove a constructive discharge claim, a plaintiff must show that "an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign.  Working conditions must be so severe that the plaintiff simply had no choice but to quit."[72]  The Tenth Circuit "evaluate[s] the voluntariness of an employee's resignation under an objective, totality of the circumstances standard."[73]

No reasonable jury could find that Plaintiff was constructively discharged.  Plaintiff resigned after one year of working in the hybrid position, where she had different supervisors with whom she got along well.  She references a lack of training in the new position, but does not come forward with evidence that the lack of training made it impossible to do her job. Plaintiff also references a delay of pay and denial of sick leave, but does not explain why those actions caused her any difficulty in performing her job.  Plaintiff also fails to identify any evidence that her resignation was involuntary.  The Court finds that Plaintiff simply presents insufficient information about the working conditions at the hybrid position for a reasonable jury to conclude that she was constructively discharged.  There is no evidence in the record to support a finding that a reasonable person in Plaintiff's position would have been forced to resign. Therefore, Plaintiff fails to set forth a prima facie case for race discrimination under a constructive discharge theory.

---

[71] *See Fischer v. Forestwood Co.*, 525 F.3d 972, 980 (10th Cir. 2008) ("Even if an employee resigns, the plaintiff may still satisfy the adverse employment action requirement by demonstrating that he was constructively discharged.  The plaintiff's burden in establishing constructive discharge is substantial." (citations omitted)).

[72] *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004).

[73] *Fischer*, 525 F.3d at 980 (citing *Exum*, 389 F.3d at 1136).

Defendant is entitled to summary judgment on Plaintiff's race-discrimination claim because she does not raise a genuine dispute of material fact that she was discriminated against in any of the employment actions discussed above.

## 2.   Retaliation

"Section 1981 'prohibits not only racial discrimination but also retaliation against those who oppose it.'"[74]  Retaliation claims under § 1981 mirror Title VII retaliation claims and are subject to the same *McDonnell-Douglas* burden-shifting framework.[75]  "However, unlike Title VII, which protects against various forms of discrimination including discrimination based on sex, § 1981 protects against only discrimination based on race.  Thus, to state a retaliation claim under § 1981, a plaintiff must have opposed race-based discrimination."[76]  Here, though Plaintiff purports to offer direct evidence of retaliation, she offers only circumstantial evidence which requires inferential steps to reach a finding of discrimination.[77]  Thus, the Court considers whether Plaintiff establishes a prima face case of retaliation by showing "that '(1) [she] engaged in opposition to racial discrimination that is protected under the statute; (2) a reasonable person would have found the challenged action materially adverse; and (3) a causal connection existed between the protected activity and the adverse action.'"[78]

Defendant argues that Plaintiff fails to prove all three elements of the prima facie case of retaliation because (1) she never specifically opposed race-based discrimination; (2) she was not

---

[74] *Salemi v. Colo. Pub. Emps.' Ret. Ass'n*, 747 F. App'x 675, 696 (10th Cir. 2018) (quoting *Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017)).

[75] *See id.* at 696–97.

[76] *Id.* at 697 (citations omitted).

[77] *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117–18 (10th Cir. 2007) (explaining that "[d]irect evidence demonstrates on its face that the employment decision was reached for discriminatory reasons," but "evidence is not 'direct' if an inference of discrimination is required." (alteration in original) (citations omitted) (quoting *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002))).

[78] *Salemi*, 747 F. App'x at 697 (alteration in original) (quoting *Parker Excavating, Inc.*, 863 F.3d at 1220).

subject to an adverse employment action; and (3) even if Plaintiff was subject to an adverse action, none of the challenged actions occurred within three months of any protected activity. Plaintiff responds that all of the harassing conduct in this suit took place after, and because of, her initial informal complaint to Nirschl about the work environment.  Plaintiff asserts that her complaints to management prompted retaliatory harassment from Nirschl and coworkers, and ultimately forced her to resign.

Plaintiff does not identify when she first complained to Nirschl and why that complaint constituted protected opposition to race-based discrimination, or which action she suffered that a reasonable employee would find materially adverse.  Instead, Plaintiff generally asserts that she "complained to Nirschl, and in short order Bradley was the target of both those about whom she complained, and the person to whom she complained."[79]  Viewing the evidence in the light most favorable to Plaintiff, she made an informal verbal complaint to Nirschl sometime in 2016. Regardless of the exact date, this complaint falls outside the four-year statute of limitations.  As described above, Plaintiff may refer only to actions after March 9, 2019 in her retaliation claim.

There is no evidence of any protected opposition to race discrimination within the statute of limitations.  The closest actions are Plaintiff's letter of personal concern from February 2018, her Charge of Discrimination filed on July 16, 2018, and her Amended Charge filed sometime in February 2019.  Only the charges of discrimination explicitly mentioned race discrimination, but both were filed outside the statute of limitations.  Thus, Plaintiff fails to state a prima facie case for retaliation under § 1981, and Defendant is entitled to summary judgment on this claim.

---

[79] Doc. 42 at 28.

C.      **Hostile Work Environment Claim**

To establish a hostile work environment claim under § 1981,[80] "a plaintiff must establish

the following four elements: '(1) she is a member of a protected group; (2) she was subject to

unwelcome harassment; (3) the harassment was based on [race]; and (4) [due to the harassment's

severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's

employment and created an abusive working environment.'"[81]  To be actionable, the conduct in

question must be severe or pervasive enough to create an environment that a reasonable person

would find hostile or abusive and the victim must subjectively regard that environment as

abusive.[82]  Courts must examine the totality of the circumstances to determine the existence of a

hostile work environment, including "the frequency of the alleged discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance;

and whether it unreasonably interferes with an employee's work performance."[83]

To prove that a racially hostile work environment exists, "the 'plaintiff must show more

than a few isolated incidents of racial enmity.'"[84]  However, the Tenth Circuit "ha[s] long held

that '[f]acially neutral abusive conduct can support a finding of [racial] animus sufficient to

sustain a hostile work environment claim when that conduct is viewed in the context of other,

overtly [racially]-discriminatory conduct.'"[85]

---

[80] *See Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015) ("The same substantive standards apply to a hostile work environment claim regardless of whether the plaintiff has brought it under § 1981 or Title VII.").

[81] *Id.* at 1222 (alterations in original) (quoting *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007)).

[82] *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993).

[83] *Id.* at 23.

[84] *Lounds*, 812 F.3d at 1223 (quoting *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998)).

[85] *Id.* at 1224 (second, third, and fourth alterations in original) (quoting *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 960 (10th Cir. 2012)).

Defendant concedes that Plaintiff is a member of a protected class, but argues that Plaintiff cannot demonstrate a genuine issue of material fact as to the other elements of this claim.  Defendant asserts that any workplace issues Plaintiff faced were due to her own problematic behavior, as evidenced by the numerous complaints coworkers made about her to Nirschl and HR.  Plaintiff responds that she faced evident harassment, all of which was racially tinged, and that it was severe enough to force her to resign.

### 1.      Harassment Based on Race

As described above, the Court may consider evidence from before March 9, 2019 in its analysis of Plaintiff's hostile work environment claim, but only if an act contributing to the racially hostile environment took place within the statute of limitations, and Plaintiff proves that each challenged act constitutes part of the same hostile environment.[86]  As an initial matter, Bolz's comment asking Plaintiff if he "sounded like a n****r"[87] occurred on June 30, 2019— within the statute of limitations.  Even one use of the n-word can support a racially harassing environment,[88] thus, Plaintiff need only show that the events she complains of prior to March 9, 2019 constituted part of the same environment where Bolz used the n-word.

Plaintiff alleges that the harassment started when she first began working for the BPU, and a cartoon depicting President Obama as a monkey was displayed in the common room. Plaintiff then asserts that there were racially coded comments about the United Way presentation, with a coworker saying he did not give to people like that, allegedly intimating people of color.  Plaintiff also alleges that there was a general environment of offensive comments, with coworkers making derogatory statements about gay people, Jewish people,

---

[86] *See Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1154 (10th Cir. 2008).

[87] Doc. 39-2 at 137:6–11.

[88] *Lounds*, 812 F.3d at 1230.

Latino people, and transgender people.  Plaintiff also asserts that coworkers undermined her, refused to trade shifts with her, stole items out of her work cabinet, and followed her outside of work.  She was also written up twice and issued conduct memoranda which were eventually downgraded to lesser discipline.

A reasonable jury could find that Bolz's comment alone demonstrates that Plaintiff was subjected to harassment based on race.  The Tenth Circuit has explained that the n-word is a "powerfully charged racial term" that can have a strong pollutant effect on an environment, regardless of the speaker's intent in using the term.[89]

## 2.   Severe and Pervasive

The next question is whether Plaintiff creates a genuine dispute of material fact as to the pervasiveness or severity of the allegedly hostile environment.  The Court must view the overtly racial incidents of harassment (n-word, Obama cartoon) in context with racially neutral harassment (coworkers treating Plaintiff like she was dangerous, playing pranks on her, stealing items from her cabinet, etc.).[90]  The Tenth Circuit has cautioned that "'the severity and pervasiveness evaluation is particularly unsuited for summary judgment' because it is inherently fact-found by nature."[91]  The frequency and severity of the challenged actions are part of this analysis.[92]

Plaintiff's allegations about racial hostility towards African-Americans include Bolz's use of the n-word on June 30, 2019, Miller's reference to Black people as "dumb," and the cartoon depicting President Obama as a monkey, which was displayed in the common room for a

---

[89] *Id.*

[90] *See id.* at 1224.

[91] *Id.* at 1222 (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)).

[92] *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

period of years.  Plaintiff also generally asserts that coworkers were racially hostile towards other groups of people, such as Mexican and Jewish people.  Plaintiff testified that Bolz and Downing said "Jewish people are stingy" and that Mexican people were "stealing the jobs" and were dirty.[93]

Plaintiff also identifies the following race-neutral conduct as part of the allegedly hostile work environment: Downing's comment that he did not "give to people like that"[94] after the United Way presentation; theft of items from her work cabinet; coworkers' refusal to trade shifts with Plaintiff; rumors that Plaintiff was dangerous; two write-ups which were eventually downgraded; the spray-nozzle incident; the deactivation of her badge for one day; the denial of vacation; lack of flexibility in scheduling; Nirschl's request that she alter chemical ratios once; and coworkers' undermining Plaintiff when it came to maintenance recommendations.

Thus, viewing the facts in the light most favorable to Plaintiff, the Court establishes the following loose timeline of events: the Obama cartoon was displayed for a couple of years, starting in 2013; the United Way presentation and Downing's comment that he did not "give to people like that"[95] took place sometime between 2013 and 2016; items were stolen from Plaintiff's cabinet twice, in August 2016 and May 2017; coworkers' refusal to trade shifts with Plaintiff occurred sometime between 2016 and 2017; rumors that Plaintiff was dangerous started around 2016 or 2017; Nirschl issued two conduct memoranda to Plaintiff in September 2017 and February 2018; the spray nozzle incident occurred in July 2018; Nirschl asked Plaintiff to change chemical ratios in February 2019; and Bolz used the n-word on June 30, 2019.  Sometime within that period, Bolz and Downing made derogatory comments about Mexican and Jewish people.

---

[93] Doc. 42-2 at 232:08–233:10.

[94] *Id.* 60:18–20.

[95] Doc. 42-2 at 60:18–20.

Upon a review of the challenged events, a reasonable jury could find that the racial harassment was severe or pervasive, such that it altered a term, condition, or privilege of Plaintiff's employment.  Plaintiff testified that the use of the n-word was common at the NWTP, and her specific example of Bolz's comment is strong evidence of a racially harassing environment.  The presence of the racist cartoon in the common room, for a period of years, is also strong evidence of racial harassment.  The Tenth Circuit has explained that the presence of racially offensive words or imagery in common areas "may well reveal more about what is acceptable in the work environment than any EEO manuals," by sending a message that minority employees are "not welcome in the workplace" and "that overt expressions of racism would not be taken seriously."[96]  Additionally, derogatory comments about people of other races, in Plaintiff's earshot, is supporting evidence of a racially harassing environment.[97]

Defendant asserts that none of these actions are evidence of racial harassment, but instead demonstrate that Plaintiff was a problem employee.  Defendant points to Plaintiff's coworkers' numerous complaints to HR as supporting evidence.  Plaintiff comes forward with evidence that her coworkers treated her as if she were dangerous, avoided her, played pranks on her, and refused to work with her.  Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could view the racially-neutral challenged actions discussed above as evidence of underlying racial hostility when viewed along with overtly racially hostile actions.[98]  Thus,

---

[96] *See Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1148 (10th Cir. 2008) (citation omitted).

[97] *See Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 959 (10th Cir. 2012).

[98] *See id.* at 960 (explaining that, when a plaintiff introduces both race-based and race-neutral evidence of harassment, the case should go to the jury if the jury "reasonably could view all of the allegedly harassing conduct . . . as the product of [racial] hostility." (alteration and omission in original) (quoting *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005))).

considering the totality of the circumstances, a reasonable jury could find that Plaintiff "was offended by the work environment and that a reasonable person likewise would be offended."[99]

With the understanding that this inquiry is particularly unsuited to summary judgment, the Court finds that a reasonable jury could conclude that the racial harassment at NWTP was severe or pervasive. Therefore, the Court finds that Plaintiff has raised a genuine dispute of material fact as to whether she was subjected to a racially hostile environment at the BPU from her initial date of employment until September 1, 2019.

### D.    Municipal Liability

Finally, Defendant moves for summary judgment on the basis that it cannot be liable for the actions of its employees under § 1981 even if Plaintiff can show a genuine issue of material facts on the merits of each claim. As a municipal agency, Defendant "cannot be held liable . . . on a *respondeat superior* theory for merely employing a tortfeasor. Rather, municipalities are subject to liability only for their *official* policies or customs."[100] Municipal liability standards articulated under § 1983, such as the seminal Supreme Court case *Monell v. Department of Social Services of the City of New York*,[101] apply with equal force to actions under § 1981.[102] With regard to hostile work environment claims, the Tenth Circuit has expressly delineated between suits under Title VII and § 1983, noting that "[u]nlike the standard applied to a Title VII claim, which permits recovery against the employer under vicarious liability principles if the

---

[99] *See id.* at 958.

[100] *Mitchell v. City & Cnty. of Denver*, 112 F. App'x 662, 671 (10th Cir. 2004) (emphasis in original) (citing *Monell v. Dept's of Soc. Servs.*, 436 U.S. 658, 691 & 694 (1978)).

[101] 436 U.S. 658 (1978).

[102] *See Randle v. City of Aurora*, 69 F.3d 441, 446 n.6 (10th Cir. 1995); *Mitchell*, 112 F. App'x at 671.

harasser is a supervisor, [a municipality] cannot be held liable under § 1983 'solely because it employs a tortfeasor.'"[103]

The Tenth Circuit has explained the various ways to establish municipal liability as follows:

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law' "; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."[104]

"Whether an official has final policymaking authority in a particular area is a question of state law."[105]

Defendant asserts that Plaintiff fails to show that she suffered discrimination, retaliation, or a hostile work environment, as a result of a municipal custom or policy. Defendant argues that Plaintiff improperly attempts to hold it responsible for the actions of coworkers and supervisors who do not constitute final policymakers under *Monell*. Defendant directs the Court

---

[103] *Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 759 (10th Cir. 2014). Defendant also asserts that the *Faragher/Ellerth* affirmative defense applies to Plaintiff's hostile work environment claim and shields it from vicarious liability for the actions of its supervisors. *See Pa. State Police v. Suders*, 542 U.S. 129, 143 (2004) (noting that the *Faragher/Ellerth* framework was "established to govern employer liability for sexual harassment by supervisors."). The Court need not consider this affirmative defense given that Plaintiff cannot establish a genuine issue of material fact that municipal liability lies against Defendant. *See Kramer*, 743 F.3d at 743–60 (considering the *Faragher/Ellerth* defense in the analysis of the Title VII claims against the municipality defendant, but considering only *Monell* liability on the § 1983 claims); *Tilghman v. Kirby*, 662 F. App'x 598, 601–03 (10th Cir. 2016) (same).

[104] *Bryson v. Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010)).

[105] *Starrett v. Wadley*, 876 F.2d 808, 818 (10th Cir. 1989) (citations omitted).

to its Charter Ordinance, which provides that the BPU's General Manager "shall have charge of all  . . . employees of the board, including, but not limited to, their hiring, appointment, promotion, transfer, assignment and demotion, discipline, layoff, suspension, discharge, and removal."[106]  In essence, Defendant argues that only Johnson, or the Board itself, may act as a final policymaker for the BPU.  In response, Plaintiff does not argue that she can show the existence of an express discriminatory policy or an informal custom of discrimination; rather, she asserts that Nirschl was a final policymaker.  Plaintiff notes that municipalities may be held liable for a "single decision"[107] of final policymakers, and that Nirschl's initiation of discipline against her is sufficient to impose "single decision" liability on Defendant.  Plaintiff argues that Nirschl acted as a final policymaker because any initiation of discipline could ultimately lead to termination.

Plaintiff argues that two prior cases in this District against Defendant Unified Government found that Defendant could be held liable under *Monell* for actions taken by BPU employees.[108]  But the Court finds both cases distinguishable.  In *Walton v. Unified Government*,[109] the plaintiff asserted that Defendant terminated him from the BPU based on his race, in violation of § 1981.[110]  Municipal liability was clear because the evidence showed "that BPU General Manager William Johnson was the final policymaker as to all employment

---

[106] Charter Ordinance No. CO-5-01, accessible at https://library.municode.com/ks/wyandotte_county_-_unified_government/codes/code_of_ordinances?nodeId=APXACHORRE_CHTR_ORDINANCE_NO._CO-5-01

[107] *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986) (limiting municipal liability based on a "single decision" to situations "where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.").

[108] *See Ledbetter v. Unified Govt. of Wyandotte Cnty./ Kansas City, Kan.*, No. 21-2502, 2023 WL 6294867, at *9–10 (D. Kan. Sept. 27, 2023); *Walton v. Unified Govt. of Wyandotte Cnty./ Kansas City, Kan.*, No. 21-2532, 2023 WL 3948634, at *2 (D. Kan. June 12, 2023).

[109] *Walton*, 2023 WL 3948634.

[110] *Id.* at *1.

decisions for the BPU and Johnson made the decision to terminate Plaintiff's employment . . . ."[111]  Thus, the municipality was responsible because Johnson acted as a final policymaker in the area of his delegated power.[112]  Here, however, Johnson did not terminate Plaintiff.  Instead, Plaintiff resigned, and there is no genuine issue of material fact that she was not constructively discharged.

In *Ledbetter v. Unified Government*,[113] the plaintiff asserted that Defendant "dismissed him from the BPU Lineman Apprentice Program based on his race," in violation of § 1981.[114]  The plaintiff was not terminated from the BPU, but was returned to the position he held before admittance into the apprentice program.[115]  Judge Crouse found that "the BPU and its General Manager delegated their final authority over apprentice firing to the Apprentice Committee," and there were no facts to support a finding that the BPU or its General Manager exercised "meaningful review" over the Committee's decisions.[116]  Thus, in that case, the Apprentice Committee acted as a final policymaker over membership in the apprentice program, and the plaintiff challenged its decision to remove him from the program.  Here, there is no evidence to support a finding that the BPU or Johnson delegated final authority to Nirschl in any respect.

It is undisputed that Nirschl had the authority to initiate conduct memoranda, as did all supervisors, but Plaintiff makes no attempt to show that this authority was final.  It is uncontroverted that HR set the discipline for all conduct memoranda and Johnson had to approve any termination.  Even viewing the facts in the light most favorable to Plaintiff, the Court finds

---

[111] *Id.* at *2.

[112] *Id.*

[113] *Ledbetter*, 2023 WL 6294867.

[114] *Id.* at *1.

[115] *Id.* at *3.

[116] *Id.* at *9.

that HR exercised meaningful review over Nirschl's recommendations of discipline because HR ultimately downgraded both memoranda after the grievance process.  Neither of Nirschl's memoranda were ultimately placed in Plaintiff's file.  Plaintiff's arguments that she was "subject to the same progressive discipline policy that could ultimately lead to termination by the General Manager"[117] are ineffective, standing alone, to find that Nirschl acted as the final policymaker when he initiated conduct memoranda against Plaintiff.

Plaintiff relies entirely on the argument that Nirschl acted as a final policymaker and does not attempt to argue the existence of a custom or policy of discrimination under *Monell*.  Indeed, Plaintiff's theory of liability in this case is that she was singled out for negative treatment, not that there was a widespread custom of race discrimination at the BPU.  Therefore, because there is no genuine issue of material fact that Nirschl did not act as a final policymaker when he initiated conduct memoranda against Plaintiff, Plaintiff cannot establish a basis for municipal liability on Plaintiff's 1981 claims.[118]

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 38) is **granted**.  The Clerk is directed to prepare a judgment in favor of Defendant and terminate this action.

**IT IS SO ORDERED.**

Dated: August 20, 2024

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[117] Doc. 42 at 22.

[118] *Accord Brooks v. Unified Gov't of Wyandotte Cnty., Kan.*, No. 23-2248-KHV, 2024 WL 3677620 (D. Kan. Aug. 6, 2024) (granting summary judgment to Unified Government on § 1981 claims of discrimination and retaliation because record lacked evidence to support any of the five grounds for municipal liability).